OA 91  Criminal Complaint

# United States District Court

NORTHERN _____ DISTRICT OF _____ CALIFORNIA

UNITED STATES OF AMERICA
V.

CASILDA SHIPPING, LTD., GENESIS SEATRADING CORP., and
THOMAS PANTELIS,

**CRIMINAL COMPLAINT**

Case Number:

☐ ORIGINAL

WDB

4-08-70357

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about Jan. 2008 through May 2008 in Alameda County, in the Northern District of California defendant(s) did,

(Track Statutory Language of Offense)

knowingly and willfully conspire and agree to commit offenses against the United States, namely to make false statements and to maintain a false Oil Record Book and false Garbage Record Book; knowingly and willfully make false statements and use false writings within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security; knowingly fail to maintain an Oil Record Book; and knowingly fail to maintain a Garbage Record Book.

in violation of Title 18 United States Code, Section(s) 371; 1001(a)(3); and 33 U.S.C. § 1908(a).

PENALTIES: 18 U.S.C. § 371 – Conspiracy: 5 years imprisonment, $250,000 for individual and $500,000 for organization, 3 years supervised release for individual and 5 years probation for organization, $100 special assessment. 18 U.S.C. § 1001 – False Statements to United States Coast Guard (2 Counts): 5 years imprisonment, $250,000 for individual and $500,000 for organization, 3 years supervised release for individual and 5 years probation for organization, $100 special assessment. 33 U.S.C. § 1908(a) – Act to Prevent Pollution from Ships (2 Counts): Class D Felony -- 10 years imprisonment, $250,000 for individual and $500,000 for organization, 3 years supervised release for individual and 5 years probation for organization, $100 special assessment.

I further state that I am a(n) Lieutenant Junior Grade in the U.S. Coast Guard and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

Approved As To Form: STEPHEN G. CORRIGAN
AUSA

Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

6-13-08
Date

at San Francisco, California
City and State

MARIA-ELENA JAMES   U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Daniel J. Every, being duly sworn, declare as follows:

1.  I am a Lieutenant Junior Grade in the United States Coast Guard ("U.S. Coast Guard"), stationed at Coast Guard Island in Alameda, California. I am currently assigned as the Branch Chief of the Sector San Francisco Prevention Department, Port State Control Branch. My current duties and responsibilities include conducting regulatory examinations of ocean-going vessels that enter the San Francisco Bay area. Sometimes my regulatory examinations yield information that provide reasonable grounds to begin a subsequent criminal investigation.

2.  I hold a Bachelor of Science degree in Maritime Operations and Technology from the United States Merchant Marine Academy in Kings Point, Long Island, New York. I earned my officer commission in the U.S. Coast Guard on August 19, 2006. As an officer in the U.S. Coast Guard, I am a qualified Port State Control Examiner and Foreign Freight Vessel Examiner. Since October 2006, I have boarded and examined over 100 ocean-going foreign flag commercial vessels. Prior to joining the U.S. Coast Guard, I earned a U.S. Coast Guard issued U.S. Merchant Marine Officer's License as a Third Mate for Steam or Motor Vessels of any gross registered tons upon oceans. Also prior to joining the U.S. Coast Guard, I earned a number of additional certifications. Specifically, through a combination of duty at sea aboard merchant vessels and through a series of U.S. Coast Guard examinations, I also qualified for the following Merchant Marine document endorsements making me a Qualified Member of the Engine Department: (1) Junior Engineer; (2) Electrician; (3) Deck Engineer; (4)

Oiler; (5) Pumpman; and (6) Tankerman Assistant. I have approximately 455 days of sea service aboard a combination of U.S. flag commercial merchant vessels and U.S. Merchant Marine Academy training vessels. I also have maritime experience as an Able Seamen working on an auto-passenger ferry on the Long Island Sound.

3. As a commissioned officer in the U.S. Coast Guard with the Port State Control Branch, my regulatory examinations focus on the enforcement of maritime statutory and regulatory framework. In particular, the United States is part of an international agreement known as the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 (the "MARPOL Protocol") that regulates the discharge of oil, garbage, and other substances from vessels at sea. The MARPOL Protocol was embodied in agreements that the United States ratified and was implemented in the United States by the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901, *et seq*. APPS makes is it a crime for any person to knowingly violate the MARPOL Protocol, APPS, or regulations promulgated under APPS. These regulations apply to all commercial vessels operating in the navigable waters of the United States or while in a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States.

4. On or about May 26, 2008, a vessel called the *M/V Rio Gold* ("*Rio Gold*") arrived at the Port of Oakland to load cargo. The *Rio Gold* is a 23,663-ton ocean-going bulk cargo ship that is approximately 626-feet in length. The *Rio Gold* was built and sent to sea in 1984. The vessel is owned by CASILDA SHIPPING LTD., Malta, and operated by GENESIS SEATRADING CORPORATION, Greece. The *Rio Gold* is registered in

Malta, and has an International Maritime Organization ("IMO") number of 8408521. It has a crew of approximately twenty-four people.

5. The *Rio Gold* was engaged in the carriage of bulk products in world-wide commerce. Prior to arriving at the Port of Oakland, the *Rio Gold* had most recently delivered a cargo load of powdered cement to a port in Hawaii. On or about May 18, 2008, the vessel left Hawaii en route to the Northern District of California.

6. On board the *Rio Gold*, there is a crew of about ten seamen of different ranks working on the deck. By order of rank, those seamen include, the Chief Officer, the Second Officer, the Third Officer, the Bosun, three Able Seamen, and three Ordinary Seamen. These seamen are responsible for the vessel's deck maintenance and cargo operations. A crew of about ten seamen of different ranks work in the vessel's engine room. By order of rank, those seamen include, the Chief Engineer, the Second Engineer, the Third Engineer, the Fourth Engineer, the Electrician, three Oilers, the Fitter, and the Wiper. The remainder of the crew consists of the Cook and two Messboys. The entire crew is led by the Captain—sometimes called the Master—of the vessel.

7. THOMAS PANTELIS is the Chief Engineer aboard the *Rio Gold*. As Chief Engineer, he is responsible for the vessel's engine room operation and supervision of the engine room crew. He has served as the vessel's Chief Engineer since reporting aboard on or about December 28, 2007.

8. Following the arrival of the *Rio Gold* in Oakland, California, on or about May 26, 2008, the U.S. Coast Guard received independent reports from crew members of the *Rio Gold* who stated that the vessel had been illegally disposing of: (i) waste oil, oily water, and oily sludge from the engine room; and (ii) hydraulic oil and garbage from the

deck. According to the reports, the vessel illegally disposed of these substances directly into the ocean. Relying on those reports, the U.S. Coast Guard boarded the *Rio Gold* at the Port of Oakland on May 27, 2008 and began conducting a regulatory examination which developed information giving reasonable grounds to begin a subsequent criminal investigation. I was the U.S. Coast Guard officer who acted as the lead inspector during the examination of the *Rio Gold* matter.

9. By way of background, it is helpful to explain the basic operations of the deck and engine areas of a large marine vessel like the *Rio Gold*.

10. The deck operations on large marine cargo vessels like the *Rio Gold* often involve the use of hydraulic oil to operate deck cranes and cargo hatch covers. The deck of the *Rio Gold* houses four large cranes used to transfer cargo to and from the vessel's four large cargo holds. Each of the four cranes has a fabricated metal drum at its base. Each drum is designed to collect the hydraulic oil that leaks from the adjacent crane and to prevent that hydraulic oil from spilling onto the vessel's deck. As the hydraulic oil from the cranes begin to fill the drums, the deck crew must transfer the collected hydraulic oil into the ship's holding tanks for either incineration or disposal at a port.

11. The deck operations on large marine cargo vessels like the *Rio Gold* often involve the use of chemical cleaning agents to clean the deck and cargo hold areas. Prior to arriving at the Port of Oakland, the *Rio Gold* had most recently delivered a cargo load of powdered cement to a port in Hawaii. When cargo vessels transport cement it is common for the powdered cement to collect in the cargo hold and the deck area. As the powdered cement mixes with moisture from sea water and weather, the cement begins to harden thereby requiring labor-intensive cleanup. A common method to loosen and clean

the hardened cement from the cargo hold and the deck areas is for the deck crew to scrub and scrape the areas after spraying with hydrochloric acid and sea water. The *Rio Gold* stored its cleaning agents, like hydrochloric acid, in the Bosun storage compartment located in the bow of the vessel.

12.     The engine department operations on large marine cargo vessels like the *Rio Gold* generate large quantities of sludge that is created when crude oil used to fuel the ship is purified by the ship's oil purifiers. That resulting sludge by-product is transferred to a sludge tank that is located in an area in the bottom of the vessel, known as the bilges. The sludge is supposed to be disposed of either by incineration in the ship's incinerator or off-loading it at a port through the use of a licensed hauler. Marine cargo vessels like the *Rio Gold* also generate large quantities of oil-contaminated bilge waste created when water collects and mixes in the bottom of the vessel, with oil leaked and dripped from the engine's lubrication and fuel systems. These "oily mixtures" are also known as "bilge slops" and "slops from bilges" and are collected, stored, and processed to separate the water from the oil and other wastes. If done in accordance with the law, the water separation involves the use of a pollution prevention control devices known as an Oil Water Separator and an oil-sensing device known as an Oil Content Meter. The Oil Water Separator works by separating the oil from the water. After the Oil Water Separator separates the oil from the water, the oil is transferred to a bilge holding tank—near the sludge tank, and the water is transferred to the Oil Content Meter. The Oil Content Meter evaluates the oil content in the water sample of the effluent that comes from the Oil Water Separator. If the Oil Content Meter determines that the oil content of the effluent exceeds fifteen (15) parts per million ("ppm"), then an audio and

visual alarm would sound a solenoid three-way valve would be triggered to redirect the effluent to a storage tank in the vessel. If the Oil Content Meter determines that the oil content of the effluent was fifteen (15) ppm or less, then the effluent is sufficiently clean and is discharged overboard.

13.   Large marine vessels like the *Rio Gold* also generate significant quantities of garbage in the course of their operations. Vessels may always retain trash onboard for later disposal at a port. Vessels may also dispose of garbage through incineration, or, as more fully described below, by disposing of specified non-plastic garbage into the ocean when within appropriate maritime zones.

14.   During my physical examination of the Rio Gold and the subsequent criminal investigation, I interviewed approximately twenty-two of the crew members. I discovered evidence of violations occurring on the deck and in the engine room.

15.   During my investigation of the *Rio Gold's* engine room operations, I learned that beginning no later than in or about January 2008 and continuing until in or about May 2008, in the Northern District of California and elsewhere, including on the high seas, the Chief Engineer, THOMAS PANTELIS, ordered subordinate crew members to deliberately and routinely discharge oil residue including sludge, oily mixtures, slops from bilges, and bilge waste that accumulated in machinery spaces from the *Rio Gold* overboard directly into the ocean environment, at various times and places, using equipment and procedures that completely circumvented the Oil Water Separator and Oil Content Meter. This equipment included a portable pump, by-pass pipes, hoses, and connectors. Such by-pass equipment is commonly referred to as a "magic pipe." One of the *Rio Gold* engine room crew members provided me with a video shot with a

cell phone video camera depicting the "magic pipe" by-pass equipment in operation while the vessel was en route to Oakland, California.

16.   I also learned through the interviews of the crew members that certain members of the crew of the *Rio Gold*, by order of THOMAS PANTELIS, constructed the by-pass system and used the system to discharge waste oil directly into the ocean. Prior to entering a port, THOMAS PANTELIS ordered crew members to disassemble the by-pass system to conceal the by-pass equipment. In doing so, he would order the crew to then reassemble the *Rio Gold*'s oil pollution prevention equipment in order to conceal the unlawful conduct from the U.S. Coast Guard.

17.   During my examination of the *Rio Gold's* Oil Record Book, I found entries that I believe to be false. In particular, I believe that the *Rio Gold* falsely reported the lawful disposal of oil residue including sludge, oily mixtures, slops from bilges and bilge waste that accumulated in machinery spaces and created the overall false impression, through the false entries and omissions, that the Oil Water Separator was being operated properly and that the Oil Record Book was being properly maintained.

18.   During my examination of the *Rio Gold's* deck operations, I learned about the unauthorized discharge of garbage from the ship. Specifically, that between on or about May 18, 2008 and on or about May 27, 2008, the Chief Officer was responsible for the discharge of hydraulic oil, a metal bucket, hydrochloric acid, and a plastic barrel over the side of the ship and directly into the ocean. In particular, the Chief Officer ordered crew members to dump buckets of hydraulic oil into the ocean, including the metal bucket. I also learned that the Chief Officer ordered, and then assisted, a number

of crew members in lifting a plastic barrel of hydrochloric acid over the side of the ship and into the ocean.

19. During my examination of the *Rio Gold's* records, I also learned that the crew of the *Rio Gold*, made and used a false and fictitious Garbage Record Book that falsely omitted the unlawful disposal of prohibited items.

20. Based on the aforementioned facts, and my training and experience there is probable cause to believe that the defendants, THOMAS PANTELIS; CASILDA SHIPPING, LTD., acting through its agents and employees who were acting within the scope of their agency and employment, and for the benefit of CASILDA SHIPPING, LTD.; AND GENESIS SEATRADING CORP., acting through its agents and employees who were acting within the scope of their agency and employment, and for the benefit of GENESIS SEATRADING CORP., and others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States, in violation of Title 18 U.S.C. section 371, to do the following:

(a.) knowingly and willfully make false statements and use false writings in a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, knowing the same to contain materially false, fictitious, and fraudulent entries, namely, a false Oil Record Book for the *Rio Gold* that contained materially false statements and from which other material information was omitted, for the purpose of concealing overboard discharges of sludge, oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces, the circumvention of required oil pollution prevention equipment, and creating the overall false impression

that the vessel was being operated properly and was properly maintaining the Oil Record Book, in violation of Title 18, United States Code, section 1001(a)(3);

(b.) knowingly and willfully make false statements and use false writings in a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, knowing the same to contain materially false, fictitious, and fraudulent entries, namely, a false Garbage Record Book for the *Rio Gold* that contained materially false statements and from which other material information was omitted, for the purpose of concealing overboard discharges of hydraulic oil, a metal bucket, hydrochloric acid, a plastic barrel, and creating the overall false impression that the vessel was being operated properly and was properly maintaining the Garbage Record Book, in violation of Title 18 United States Code, section 1001(a)(3);

(c.) knowingly fail to maintain an Oil Record Book for the *Rio Gold* in which all disposals of oil residue and discharges overboard and disposals otherwise of sludge, oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces were fully recorded, in violation of Title 33, United States Code, section 1908(a) and Title 33, Code of Federal Regulations, sections 151.25(a) and 151.25(h); and

(d.) knowingly fail to maintain an Garbage Record Book for the *Rio Gold* in which the overboard discharges and disposals of hydraulic oil, a metal bucket, hydrochloric acid, and a plastic barrel were fully recorded, in violation of Title 33, United States Code, sections 1907(d) and 1908(a), and MARPOL Annex V.

21. Based on the aforementioned facts, my training, and my experience, there is probable cause to further believe that the defendants:

(a.) did knowingly and willfully make and use and cause the making

9

and use of materially false writings and documents, in a manner within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, namely, a false and fictitious Oil Record Book for the *Rio Gold*, in violation of Title 18, United States Code, section 1001(a)(3);

  (b.) did knowingly and willfully make and use and cause the making and use of materially false writings and documents, in a manner within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, namely, a false and fictitious Garbage Record Book the *Rio Gold*, in violation of Title 18, United States Code, section 1001(a)(3);

  (c.) did knowingly fail to maintain an accurate Oil Record Book for the *Rio Gold*, namely by failing to disclose that defendants had caused the discharge of sludge, oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces through the use of a bypass pipe and procedures that circumvented the Oil Water Separator and/or the Oil Content Meter, in violation of Title 33, United States Code, section 1908(a), Title 33, Code of Federal Regulations, Section 151.25; and

  (d.) did knowingly fail to maintain an accurate Garbage Record Book for the *Rio Gold*, namely by failing to disclose that defendants had caused the overboard discharges of hydraulic oil, a metal bucket, hydrochloric acid, and a plastic barrel, in violation of Title 33, United States Code, sections 1907(d) and 1908(a), and MARPOL Annex V.

///

///

///

22.     I declare under penalty of perjury that the facts contained herein are true and correct to the best of my information and belief.

_____
DANIEL J. EVERY, Lieutenant Junior Grade
UNITED STATES COAST GUARD
CHIEF, PORT STATE CONTROL
SECTOR SAN FRANCISCO

Subscribed and sworn to before me this <u>13th</u> day of June, 2008.

_____
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF CALIFORNIA

MARIA-ELENA JAMES

11